**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

SHAVONTAE McQUEEN,
*o/b/o A.D.T., a minor,*

　　　　　　　　　　　　　　　CASE NO. 2:18-cv-13759
　　　*Plaintiff,*　　　　　　　DISTRICT JUDGE GEORGE CARAM STEEH
　　　　　　　　　　　　　　　MAGISTRATE JUDGE PATRICIA T. MORRIS

*v.*

COMMISSIONER OF SOCIAL SECURITY,

　　　*Defendant.*
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 12, 14)**

**I.  RECOMMENDATION**

　　　In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that ADT[1] is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (ECF No. 12), be **DENIED**, the Commissioner's Motion for Summary Judgment, (ECF No. 14), be **GRANTED**, and this case be **AFFIRMED**.

**II.  REPORT**

　　　**A.  Introduction and Procedural History**

　　　This is an action for judicial review of a final decision by the Commissioner of Social Security denying Plaintiff's claim for Supplemental Security Income (SSI) under

_____

[1] As ADT is a minor, the suit is brought by her mother, the Plaintiff, on her behalf.

1

Title XVI, 42 U.S.C. §§ 1381-1383f. (ECF No. 1). Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to me for review. (ECF No. 3.) Currently before the Court are Plaintiff's and Defendant's cross-motions for summary judgment (ECF Nos. 12, 14.)

The application for SSI at issue in this case was filed on October 26, 2009. (ECF No. 7, PageID.206.) ADT was determined to have been disabled since September 29, 2009. (ECF No. 7, PageID.133.) On August 23, 2014, the Agency determined that the disability would be deemed to have ceased by August 25, 2014. (ECF No. 7, PageID.131.) After Plaintiff sought reconsideration, a hearing officer upheld the decision in July 2016. (ECF No. 7, PageID.133, 136-137.) Plaintiff then requested a hearing before an administrative law judge (ALJ), which was held on January 18, 2018.[2] (ECF No. 7, PageID.78-120.) The ALJ's subsequent decision, dated April 13, 2018, upheld the determination that ADT's disability ended on August 25, 2014, and had not recommenced. (ECF No. 7, PageID.58-72.)

The Appeals Council denied Plaintiff's request for review and this action followed. (ECF No. 7, PageID.35-38; ECF No. 1.) Briefing is now complete and the case is ready for resolution.

### B.  Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to

---

[2] An earlier hearing occurred in August 2017 but was cut short when Plaintiff indicated she wished to obtain a representative and gather necessary records for the claim. (ECF No. 7, PageID.121-129.)

determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.*

## C. Framework for Disability Determinations

Under the Social Security Act, Title XVI, SSI is available to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). The claimant must have a "disability," *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), which means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

3

expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A); 20 C.F.R. § 416.905(a). A child will be considered disabled if he or she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations." 42 U.S.C. § 1382(a)(3)(C)(I). To determine whether a child's impairment results in marked and severe limitations, SSA regulations prescribe a three-step sequential evaluation process:

1.    If a child is doing substantial gainful activity, the child is not disabled and the claim will not be reviewed further.

2.    If a child is not doing substantial gainful activity, the child's physical or mental impairments will be considered to see if an impairment or combination of impairments is severe. If the child's impairments are not severe, the child is not disabled and the claim will not be reviewed further.

3.    If the child's impairments are severe, the child's impairments will be reviewed to determine if they meet, medically equal, or functionally equal a listing impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. If so, the child will be found disabled.

*See* 20 C.F.R. § 416.924(a).

In the third step of this analysis, if the child's impairments do not meet or medically equal the listings, the Commissioner assesses whether the impairments functionally equal the listings. 20 C.F.R. § 416.926a(a). "'Functioning' refers to a child's activities; that is, everything a child does throughout the day at home, at school, and in the community, such as getting dressed for school, cooperating with caregivers, playing with friends, and doing class assignments." SSR 09-1p, 2009 WL 396031, at *2 (Feb. 17, 2009). To determine functional equivalence, the regulations direct the Commissioner to evaluate how the child

functions in six domains, which are "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). These domains are:

1.    Acquiring and using information;

2.    Attending and completing tasks;

3.    Interacting and relating with others;

4.    Moving about and manipulating objects;

5.    Caring for yourself; and

6.    Health and physical well-being.

*See id.* In each domain, the Commissioner considers the types of activities the child can and cannot perform, how those activities compare to other children without impairments, where the difficulties occur (*e.g.*, at home or school), whether the child can complete activities independently, and what help the child needs with activities. 20 C.F.R. § 416.926a(b)(2).

If the child's impairments result in "marked" limitations in two domains, or an "extreme" limitation in one domain, the impairment functionally equals the listing and the child will be found disabled. 20 C.F.R. § 416.926a(d). A marked limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). It "is 'more than moderate' but 'less than extreme.'" *Id.* An extreme limitation is one that "interferes *very* seriously with [a child's] ability to independently initiate, sustain or complete activities." 20 C.F.R. § 416.926a(e)(3)(i) (italics added). "It is '"more than marked,"'" and represents "the rating [the Commissioner] give[s] to the worst limitations." *Id.*

5

If a claimant is found disabled, the Administration will "conduct continuing disabilities reviews to determine whether or not [the claimant] continue[s] to meet the disability or blindness requirements of the law." 20 C.F.R. § 416.990(a); *see generally* 42 U.S.C. § 1382c(a)(4)(B)(1) (directing termination of benefits to minors if "substantial evidence . . . demonstrates that there has been medical improvement in the individual's impairment or combination of impairments, and that such impairment or combination of impairments no longer results in marked and severe functional limitations"). Like the initial evaluation, a continuing disability review has three steps:

1.  Has there been medical improvement since the most recent favorable decision? Medical improvement means "any decrease in the medical severity of [the claimant's] impairment(s) which was present at the time of the most recent favorable decision that you were disabled or continued to be disabled." If not, then a finding of disability is generally required.

2.  If there has been medical improvement, does the "impairment(s) still meet or equal the severity of the listed impairment that it met or equaled before?" If so, then a finding of disability is generally required.

3.  If medical improvement has occurred such that the claimant no longer meets or equals the listing that it did before, the Administration "will consider whether you are disabled under the rules in §§ 416.924(c) and (d)."

*See* 20 C.F.R. §§ 416.994a(b)-(c).

### D. ALJ Findings

Following framework above, the ALJ found ADT's disability ceased on August 25, 2014, and that she had not become disabled since that date. (ECF No. 7, PageID.71-72.) Before turning to the three steps, the ALJ found that ADT was a school-age child on August 25, 2014, but was an adolescent at the time of the decision, as those terms are defined in

6

20 C.F.R. § 416.926a. (ECF No. 7, PageID.62.) Regarding the three steps, the ALJ first found medical improvement had occurred by August 25, 2014, when compared to ADT's condition at the time of the "comparison point decision" (CPD), *i.e.*, the prior determination that she was disabled as of February 2010. (*Id.*) Second, the ALJ determined that at the time of the CPD, her medically determinable impairments were "speech delay and ADHD," which the CPD found functionally equal to the listings. (ECF No. 7, PageID.61.) The ALJ also determined that ADT did not have any additional impairments at the time of the CPD and had not developed any new ones subsequently. (ECF No. 7, PageID.71.) Third, the ALJ concluded that since August 25, 2014, ADT's impairments were not functionally equal to the listings, as she had less than marked limitations or no limitations at all in the six functional domains. (ECF No. 7, PageID.62-71.)

### E.   Administrative Record

#### 1.   Medical and Academic Records

After ADT was found disabled as of 2010, the Agency was obligated to conduct reviews of that determination at least every seven years. 20 C.F.R. §§ 416.990(d), 416.994a(a). During the 2014 review, which led to the present case, Plaintiff completed a form asserting that the IEP (individualized educational plan) and troubles in math and reading were the "physical and/or mental condition(s)" limiting ADT's ability to work. (ECF No. 7, PageID.211.) Within the past year, ADT had seen medical professionals for her physical conditions but not for mental conditions, which included emotional and learning problems. (ECF No. 7, PageID.211.) Plaintiff noted that ADT struggled with managing money, concentrating, remembering, understanding and following directions,

7

completing tasks, and "[s]eeing, hearing, or speaking"; but ADT did not struggle with self-care (such as bathing and preparing meals), doing chores, shopping, various physical abilities, or getting along with people. (ECF No. 7, PageID.220.) Further, Plaintiff wrote that ADT "has a very hard time with understanding simple task[s]," became "frustrated because she doesn't understand basic math skills and can[']t keep up with her class," and struggled to recall her lessons. (ECF No. 7, PageID.221.)

In another form for the 2014 review, Plaintiff wrote that on a typical day ADT would mope and complain about school in the morning, prepare herself for school, do homework, watch television, and go to bed. (ECF No. 7, PageID.232.) Asked about ADT's social activities, Plaintiff stated that ADT "doesn[']t have to[o] many friends" because they were new to the neighborhood, "but she do[es] talk of friends at school. Very few in school and she says kids make fun of her." (*Id.*) As for interactions with adults, Plaintiff wrote that ADT was "always around me . . . and if something do[es] occur[] she just quiet and cry [*sic*]." (*Id.*) While ADT did not like the older children in the family, she loved the smaller children and babies. (*Id.*) Regarding behavior problems, she "has stolen things from the store but never nothing [*sic*] major." (*Id.*) She got tickets at school for failing to follow direction or being off-task." (*Id.*) ADT took special classes for math and reading, but Plaintiff was unsure "of the time spent outside class." (*Id.*) When things got tough or ADT could not understand something, she would cry. (*Id.*) Her daily chores included putting things away and "fix[ing] the shoes," but she needed constant reminders and supervision. (ECF No. 7, PageID.233.) Asked about personal care, Plaintiff wrote that ADT was incapable of taking care of herself: it took her a long time to tie her shoes and she usually

did it incorrectly, Plaintiff always had to "wash her up," and ADT "needs my help with everything." (*Id.*) ADT's speech could be understood only some of the time. (*Id.*) Further, ADT could answer the phone and deliver messages, as well as "explain why she did something," but she could not repeat stories. (*Id.*) She could fix simple meals well, but her monthly efforts at cooking more complex dishes were not done correctly, and she never planned or prepared an entire meal or set the table. (ECF No. 7, PageID.234.) She could write letters (and did so weekly) but they were rife with misspellings. (*Id.*)

As for chores, Plaintiff  helped clean weekly but did not do a good job, and she never mowed the lawn, shoveled snow, or did her own laundry; she did a good job babysitting for others. (*Id.*) She did not participate in any social organizations or sports. (*Id.*) She could not make change from a $5 bill and although she read daily, she was not good at it. (ECF No. 7, PageID.235.) She daily used public transportation, *i.e.*, the school bus. (*Id.*) Twice a week at school she received special services; her grades were all Fs and she struggled to stay on task and comprehend directions. (ECF No. 7, PageID.240.)

Plaintiff filled out an identical form a year later, providing a few different answers. (ECF No. 7, PageID.244-247.) Now, ADT performed her daily activities "well," and played outside, but she remained scared of making new friends and was more of a quiet loner who liked watching television. (ECF No. 7, PageID.244.) As for children in the family, ADT lacked relationships with any of them. (*Id.*) She now spent 10 hours a week in special classes. (*Id.*) Also, she was no longer expected to do household chores and she could now care for her personal needs. (ECF No. 7, PageID.245.) Those who knew her well could now understand her speech most of the time, but her lisp made it hard for others

to discern her statements. (*Id.*) Apparently ADT had stopped trying to cook and no longer babysat. (ECF No. 7, PageID.246.) She no longer used public transportation, but she now read (poorly) non-fiction and mysteries and also shopped for chips and candy in addition to toys. (ECF No. 7, PageID.247.)

Also for the 2014 review, ADT's math and reading teacher, Kim Curtis, filled out a questionnaire. (ECF No. 7, PageID.224-231.) ADT performed below her instructional level in reading, math, and "written language," and each day she required 30 minutes of special education services in reading and math. (ECF No. 7, PageID.225.) In the domain of acquiring and using information, Ms. Curtis believed ADT had a slight problem with comprehending oral instructions, understanding vocabulary, reading and comprehension, following class discussions, providing oral explanations, expressing ideas in writing; ADT had obvious problems with learning new material, applying previous material, and problem solving; and ADT had a serious problem with math. (ECF No. 7, PageID.226.) None of these activities presented a "very serious problem" for ADT. (*Id.*) ADT had no problems in the other relevant domains, including attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for herself. (ECF No. 7, PageID.227-230.)

Turning to the other materials in the record, the earliest medical report is from November 2013 when ADT saw Dr. Durdana Rehman. (ECF No. 7, PageID.278.) At the time, she was in special education classes, but she did household chores, read books, could tell time, rode a bicycle, counted above 10, and knew the alphabet. (*Id.*)

ADT's school conducted psychoeducational evaluations in November and December 2013. (ECF No. 7, PageID.282-285.) The resulting report noted that ADT had begun receiving special education services in speech and language in 2011. (ECF No. 7, PageID.282.) She likewise struggled with writing and math. (*Id.*) The school provided her general education interventions, guided reading for 30 minutes a day, one-on-one writing instruction, and accommodations and modifications in assignments, quizzes, and tests in reading, writing, and math. (*Id.*) Despite all this, her teachers reported limited academic progress. (*Id.*) At the first of three evaluative sessions, ADT was talkative, reported enjoying reading more than math or writing, and responded to encouragement. (ECF No. 7, PageID.283.) During the second, she was fatigued and began falling asleep during testing. (*Id.*) During the last session, she was more motivated in the testing but again fell asleep; she was excited to read but stumbled over words and had only 64% reading accuracy. (*Id.*)

Test results from the evaluations showed the following: her IQ score was in the low average range (although significantly below average); her verbal comprehension was average (with only mild weakness with defining words); her problem solving (perceptual reasoning) was in the low average range; her working memory was in the borderline range (higher than only 4% of her peers); and her processing speed was in the low average range. (ECF No. 7, PageID.284.) Her academic achievement scores were as follows: she was in the 3rd percentile for early reading skills; 19th percentile for reading comprehension; 21st percentile for word reading; 1st percentile for pseudoword decoding; and 7th percentile for numerical operations. (*Id.*) The evaluating school psychologist, Aguih Diop, characterized

the reading and decoding skills as below average and the reading comprehension and word recognition skills as "approaching [a]verage limits. (ECF No. 7, PageID.285.) Based on the math results, ADT "would require intensive supports in order to meet general education curriculum requirements without intensive interventions and supports." (*Id.*) Overall, the results "suggest that [ADT's] functioning meets eligibility criteria for a Specific Learning Disability certification in the areas of basic reading skills and math calculation." (*Id.*)

Following the evaluation, an IEP was developed. (ECF No. 7, PageID.288-310.) On the positive side, ADT was friendly, appeared to enjoy school, was social, liked sharing stories, and her "developmental and functional needs appear age appropriate." (ECF No. 7, PageID.290.) Also, she had progressed since her last IEP. (*Id.*) Still, she performed below average and required modifications to the math curriculum as well as direct guidance from the teacher to complete tasks; in addition, the teacher noticed issues with focus and social functioning. (*Id.*) She needed speech and language instruction to improve "vocabulary, sentence structure, comprehension, and overall communication skills," and she also needed help with math, reading, social skills, and self-confidence. (*Id.*) Reviewing the testing results from the recent evaluations and others, the IEP reported that ADT's language impairment was moderate, her social skills below average, her writing skills average. (ECF No. 7, PageID.291-295.) The modifications would include shortened assignments, adjusted deadlines, and segmented instructions. (ECF No. 7, PageID.297.) Additional services include 30-minute sessions 2 to 4 times a month with the school social worker, 30-minute sessions with a teacher consultant 2 to 4 times a week, and speech and language services for 20 to 30 minutes 6 to 8 times a month. (ECF No. 7, PageID.305.) At

the end of the IEP report, it was noted that Plaintiff's request for extended-school-year services was denied because "these services are for students who have not made gains toward their stated IEP goals, which [ADT] has, thus far." (ECF No. 7, PageID.308.)

A new IEP was completed a few months later, in February 2014, by a new school system. (ECF No. 7, PageID.312.) It repeated much of the information in the prior IEP, including the testing assessments and many of the required services. (ECF No. 7, PageID.314-320.) However, while her assignments were to be shortened, no mention was made of modifying deadlines. (ECF No. 7, PageID.320.)

In May 2014, a speech and language pathologist completed a questionnaire on ADT. (ECF No. 7, PageID.343.) ADT's impairment was noted as mild to moderate, but her speech was within normal limits. (*Id.*) ADT "has difficulty with complex directions, grade level vocabulary in speaking & writing and demonstrating understanding of what she reads." (*Id.*) She also struggled with oral and written language. (*Id.*) She was eight years old and could read at the level of a seven-year old. (*Id.*) Her vocal quality and oral motor functioning and structures were within normal limits. (ECF No. 7, PageID.344.)

In August 2014, ADT underwent a speech and language evaluation. (ECF No. 7, PageID.346.) The speech-language pathologist, Rachel Murphy, wrote that ADT's voice and fluency were within normal limits, but her articulation put her below the 1st percentile. (ECF No. 7, PageID.348.) Her intelligibility was 85 to 95%, increasing to 100% with repetition. (*Id.*) Other findings were as follows: her picture vocabulary score was average; her word ordering was below average; her relational vocabulary score was poor; her multiple meanings score was average; her sentence combining score was poor; her

organizing index score was poor; her speaking index score was poor; and her semantics score was below average. (ECF No. 7, PageID.349-351.) The informal assessment recorded ADT's struggle using consistent grammar and organizing her thoughts, but also noted that ADT did well recounting a story she had read, "demonstrated good recall of details," and did not display significant comprehension deficits. (ECF No. 7, PageID.351.) Overall, the pathologist concluded that ADT's expressive language skills were impaired and she lisped, but her pragmatic language ability, her fluency, and her voice were normal. (ECF No. 7, PageID.351-352.) The prognosis was good to fair and ADT would continue to progress, although deficits would persist for a few years and limit her verbal and written expressions. (ECF No. 7, PageID.352.) Receptive language abilities in the classroom were not a significant issue, but she might struggle comprehending lengthier or more abstract verbal information. (*Id.*)

Also in August 2014, medical consultants, Dr. Zahra Khademian and speech pathologist Cheryl Lang, completed a childhood disability evaluation form. (ECF No. 7, PageID.353.) ADT's impairments were "speech/language" and "LD." (*Id.*) Together, they were severe but did not meet, medically equal, or functionally equal a listed impairment. (*Id.*) She had less than marked limitations in acquiring and using information, the consultants opined, noting she was in the regular education program. (ECF No. 7, PageID.355.) She also displayed less than marked impairment interacting and relating to others, as evidenced by the near total intelligibility of ADT's speech, among other things. (*Id.*) In the other four domains—attending and completing tasks, moving about and

manipulating objects, caring for herself, and health—she had no limitations. (ECF No. 7, PageID.355-356.)

An IEP from October 2014 determined that ADT remained eligible for special education services. (ECF No. 7, PageID.368.) As in the other IEP's, the old test scores and evaluations were discussed, as they showed weaknesses in working memory and impairments in reading and math that would affect her in school. (ECF No. 7, PageID.369-374.) A more detailed series of modifications and supplementary programs was recorded: reading aloud tests and quizzes; allowing her to retake assignments and tests if she receives a low score; rechecking with ADT after she receives directions; breaking larger assignments into steps; providing an alternative setting for testing and quizzes at ADT's request or the teacher's discretion; giving her a copy of teacher notes and presentations; and providing breaks and an alternative setting for state assessment testing. (ECF No. 7, PageID.375-376.) "To the maximum extent appropriate," ADT would remain in regular classes. (ECF No. 7, PageID.383.) She continued to be ineligible for an extended school year because "[t]here is no documentation of the student [*i.e.*, ADT] demonstrating regression of skills beyond a reasonable period of recoupment. The student does not demonstrate a severe impairment, and does not appear to be in a critical stage of learning." (*Id.*) In addition, she did not require assistive technology because she was "making expected progress through task modification, skill remediation, or other interventions specified on the IEP." (*Id.*) Attached to the IEP was a teacher input form stating that ADT was "performing below grade level in all areas," was unfocused at times, failed to turn in work on time, and did not participate much. (ECF No. 7, PageID.385.)

15

The next IEP came in February 2015 and reported moderate progress towards her objectives and within the general education curriculum. (ECF No. 7, PageID.389-390.) Her performance remained below grade level in reading comprehension and math calculation, as were her assessment scores in these subjects. (ECF No. 7, PageID.390.) The transition to a new school had been positive, the IEP reported, and she engaged peers, although reciprocal interactions and social cues remained a struggle for her. (*Id.*) Her expressive and receptive language skills were deficient. (*Id.*) The modifications and accommodations were: extended time on classroom math assignments and all state/district assessments, use of a calculator as needed, and reduced number of math problems in assigned work. (ECF No. 7, PageID.391.) Speech and language services would be provided for 30 minutes 3 times a month, social work services for 30 minutes 2 times a month, and the resource program for 10 hours a week. (ECF No. 7, PageID.392.)

Dr. Edward Czarnecki and Sheila Ward, a speech pathologist, completed a consultative evaluation form in August 2015. (ECF No. 7, PageID.398.) They found ADT's impairments did not meet, medically equal, or functionally equal a listed impairment. (*Id.*) Regarding the domains, they found less than marked limitations in three: acquiring and using information, attending and completing tasks, and interacting and relating with others. (ECF No. 7, PageID.400.) She had no limitations in the other domains. (ECF No. 7, PageID.401.)[3]

---

[3] In the section for explaining the findings, the consultants appear to offer summaries of previous testing, although the formatting makes it someone difficult to parse. (ECF No. 7, PageID.403.) Testing from February 2010 is noted, with the findings of 50 to 70% speech intelligibility, moderate impairment in

Another speech pathologist filled out a questionnaire in fall 2015. (ECF No. 7, PageID.407-408.) ADT had a mild receptive language impairment. (ECF No. 7, PageID.407.) She was mostly intelligible despite her lisp. (*Id.*) In particular, she had difficulty with comprehension and various grammatical rules. (*Id.*) Her language skills were at a 9-year old's level (she was around 10 at the time). (*Id.*)

The next IEP is from February 2016. (ECF No. 7, PageID.409.) Her eligibility for special services continued due to her problems with basic reading skills and math calculations. (*Id.*) Her performance in these areas was below her grade level, but she was making moderate progress towards her IEP goals and through the general curriculum. (ECF No. 7, PageID.411.) She needed "intensive intervention support" to meet the general education math curriculum, including "small groups, extended time, test can be read, calculator use, and directions can be repeated." (*Id.*) Her interpersonal interactions showed "marked improvement" and her speech and language skills displayed "steady progress." (*Id.*) Her schedule of services (such as time in the resource program) remained the same. (ECF No. 7, PageID.413.)

A year later, ADT's school conducted a multidisciplinary evaluation. (ECF No. 7, PageID.418.) Her specific impairments, within the speech and language category, were based on spontaneous language samples and categories on standardized assessments; she did not meet disability criteria in articulation, voice, fluency, or language, and she did not meet disability criteria based on the adverse effect her impairment had on educational

---

articulation and expressive language, severe impairment in receptive language, and only slight problems in one domain (and none in the others). (*Id.*)

performance. (ECF No. 7, PageID.420.) She exhibited "a pattern of strengths and weaknesses in performance, achievement or both relative to student's age or state approved grade level standards or intellectual development." (*Id.*)

The last IEP in the record is from February 2017. (ECF No. 7, PageID.422.) Her specific learning disabilities were in math calculation and math reasoning. (*Id.*) In general, she was relatively strong in comprehensive knowledge, performing "well on tasks that require the ability to access and apply acquired word knowledge." (ECF No. 7, PageID.423.) "Test results indicate that [ADT] presents with a normal ability profile." (*Id.*) She had weaknesses with memory. (*Id.*)

The IEP considered her functional performance in reading and writing but found they were "not applicable" to the assessment; her problems were with math and "communication/speech & language." (ECF No. 7, PageID.424.) Regarding math, her calculation and reasoning skills were "moderately delayed." (*Id.*) Regarding "communication/speech & language," however, the IEP stated that test "scores indicate that [her] expressive and receptive language skills are within functional limits for her developmental age." (*Id.*) She struggled with some words but had strengths in the "understanding of grammatical structures, multiple meanings and . . . picture vocabulary skills." (*Id.*) In fact, a picture vocabulary test "indicates that [ADT's] understanding of age-appropriate vocabulary is on the higher side of within functional limits for her age." (*Id.*) Another test displayed age-appropriate articulation skills despite her mild distortion due to a frontal lisp. (ECF No. 7, PageID.425.) As a result, the IEP concluded that ADT's "speech and language skills are not severely impacting her ability to participate in the classroom

18

and her least restrictive environment is to be in the classroom." (*Id.*) Therefore, she no longer required services related to communication, speech, or language. (*Id.*) Regarding "socio-emotional/behavioral," she was "very nice" but had trouble with maintaining positive relationships with peers and consequently she continued to need social services. (*Id.*) Her other special accommodations all related to math and included extended time for assignments, small group setting for state/district assessments, and the use of a calculator. (ECF No. 7, PageID.426.)

## 2.    Administrative Hearing

At the hearing in January 2018, ADT testified that she was 12 years old and in the 7th grade. (ECF No. 7, PageID.85.) Her favorite subject was English, especially reading and writing; she liked math the least. (ECF No. 7, PageID.86-87.) Her grades were good and getting better. (ECF No. 7, PageID.88.) At school, she received help in math (but none in other subjects) at the resource room almost every day. (*Id.*) She took the "same math" as her classmates. (ECF No. 7, PageID.89.) She testified that she would finish her homework, at which point in the hearing Plaintiff interjected that ADT had recently become enraged when asked if she had homework and threw her phone against the wall. (ECF No. 7, PageID.91-92.)

Regarding friends, she had them at school but not a best friend; she did not hang out with any of them outside of school (although she later suggested that she did see friends outside of school). (ECF No. 7, PageID.90-91.) For fun, she played video games for hours on end, every day. (ECF No. 7, PageID.91.) She did not go on social media and rarely went to the mall or had sleepovers. (ECF No. 7, PageID.94.)

19

ADT's mother, Plaintiff, then testified. (ECF No. 7, PageID.97.) ADT did not get along well with her younger sister, sometimes becoming mean. (*Id.*) She never was held back, as the school thought ADT just needed extra resources, but she did receive special instruction in math, along with extended time for assignments she could not finish in class because she was unfocused. (ECF No. 7, PageID.99-101.) Math was the only subject she received help in "[b]ecause they felt like she has progressed" and her reading was "caught up." (ECF No. 7, PageID.101.) Regarding ADT's speech, she had a lisp that had "gotten a lot better" over time but still made it hard to understand her. (ECF No. 7, PageID.103.) Later, however, she said the lisp did not impede conversations; the real issue was her outbursts that muddled her speech. (ECF No. 7, PageID.109.) However, people who knew her had no problem figuring out her speech. (*Id.*) Still, she did not always get along with family members. (ECF No. 7, PageID.110-111.) She did get along with elders. (ECF No. 7, PageID.111.) With classmates, "it just depends on how they [were] treating her," but even when classmates were mean one day, ADT would "just want[] them to be her friend tomorrow." (*Id.*) She had a new group of friends who, her teacher reported, "affected her grades. It's the whole social dynamic of the thing." (ECF No. 7, PageID.111-112.) But she did not hang out with them, or anyone else, outside of school. (ECF No. 7, PageID.112.)

Asked if ADT had been diagnosed, Plaintiff said "Doctor haven't never —," later adding that when she was a baby ADT had been diagnosed with ADHD, but not recently and that ADT had never been prescribed medications; the resource room teacher had only recently suggested that ADT see a therapist due to her lack of focus and difficulty with friendships and social cues. (ECF No. 7, PageID.101-104) ADT saw a social worker at

school to help with her sociability. (ECF No. 7, PageID.103.) She was a loner who did not like to participate in activities or go outside; instead she spent days playing video game and she avoided doing her homework until the last possible moment. (ECF No. 7, PageID.104.) Plaintiff would read the homework and not understand ADT's answers, but because ADT was the "teacher's pet" and the teacher did not read the work, she managed to "still get the full grade." (*Id.*) And yet, ADT had not even "grasped the concept of . . . money," and could not count change. (ECF No. 7, PageID.106.) Focus was a huge problem both at school and home. (ECF No. 7, PageID.113.)

ADT frequently awoke in the middle of the night to play her video game. (ECF No. 7, PageID.105.) She could get herself ready for school. (ECF No. 7, PageID.106-107.) Her chore was taking out the garbage, but she was bad at doing it and needed constant reminders. (ECF No. 7, PageID.107.) Regarding behavioral problems, Plaintiff had received teacher reports that "[s]he talks a lot and [is] constantly moving chair. She's hitting." (ECF No. 7, PageID.108.) They considered her "a nice girl" and did not punish her misbehavior because of her underlying issues. (ECF No. 7, PageID.108-109.)

### E.    Arguments and Analysis

Plaintiff presents two arguments: (1) the ALJ erroneously analyzed four of the six functional domains; and (2) "[i]n rating the severity of ADT's limitations, the ALJ did not take into consideration the extensive help that the child requires to get through her day as

compared to her peers, as required by SSR 09-1p." (ECF No. 12, PageID.459-461.) I will address these arguments in turn.[4]

### 1.    Domains

Plaintiff argues that the ALJ erred in analyzing the following four domains: acquiring and using information; attending and completing tasks; interacting and relating with others; and health and physical well-being. (ECF No. 12, PageID.459-461.) I will address each separately.

### a.    Acquiring and Using Information

The domain of acquiring and using information focuses on "how well you [*i.e.*, the claimant] acquire or learn information, and how well you use the information you have learned." 20 C.F.R. § 416.926a(g). The thrust of the analysis is "how well a child actually uses his or her mental capacity," and thus serious limitations can exist even if the child's IQ is normal. 3 Soc. Sec. Disab. Claims Prac. & Proc. § 23:36 (2nd ed.); *see also Witherell ex rel. M.D.H. v. Comm'r of Soc. Sec.*, 2014 WL 6791381, at *4 (E.D. Mich. Sept. 30, 2014) ("IQ tests are generally understood to measure a person's cognitive capability; there is nothing in the record that suggests how that measure addresses performance, which is the focus of the first domain.").

The regulations provide age-specific abilities that claimants should display. For school-age children (ages 6 through 12) the child

> should be able to learn to read, write, and do math, and discuss history and science. You will need to use these skills in academic situations to demonstrate what you have learned; e.g., by reading about various subjects

---

[4] Plaintiff does not challenge the ALJ's step-one finding that ADT had medically improved.

and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions. You will also need to use these skills in daily living situations at home and in the community (e.g., reading street signs, telling time, and making change). You should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing your own ideas, and by understanding and responding to the opinions of others.

20 C.F.R. § 416.926a(g)(2)(iv). For adolescents (ages 12 to 18), the child

should continue to demonstrate what you [*i.e.*, the claimant] have learned in academic assignments (e.g., composition, classroom discussion, and laboratory experiments). You should also be able to use what you have learned in daily living situations without assistance (e.g., going to the store, using the library, and using public transportation). You should be able to comprehend and express both simple and complex ideas, using increasingly complex language (vocabulary and grammar) in learning and daily living situations (e.g., to obtain and convey information and ideas). You should also learn to apply these skills in practical ways that will help you enter the workplace after you finish school (e.g., carrying out instructions, preparing a job application, or being interviewed by a potential employer).

20 C.F.R. § 416.926a(g)(2)(v). Additionally, the regulations list examples of limitations in

the domain:

(i) You do not demonstrate understanding of words about space, size, or time; e.g., in/under, big/little, morning/night.

(ii) You cannot rhyme words or the sounds in words.

(iii) You have difficulty recalling important things you learned in school yesterday.

(iv) You have difficulty solving mathematics questions or computing arithmetic answers.

(v) You talk only in short, simple sentences and have difficulty explaining what you mean.

20 C.F.R. § 416.926a(g)(3). These limitations "do not necessarily describe a 'marked' or 'extreme' limitation." *Id.* In addition, the Commissioner has elsewhere offered other examples of limitations, including failing to use age-appropriate language, failing to develop the same "readiness skills" as peers, difficulty following simple instructions, difficulty understanding directions, and failing to write, read, and do arithmetic at the "appropriate grade level." SSR 09-3p, 2009 WL 396025, at *6 (Feb. 17, 2009).

In the present case, the ALJ concluded that "ADT requires some special services in school, but she has progressed academically to the point where she only requires help in math. She no longer receives speech therapy services. She is either functioning at or above age-appropriate levels in the various communication areas." (ECF No. 7, PageID.66.) Plaintiff argues that this minimizes ADT's problems:

> ADT requires an IEP just to function in school, and even with this assistance she is constantly at risk of falling behind. Plaintiff testified that ADT struggles to keep up with her classmates, and can only handle ¼-1/3 of the workload that her peers are handling (Doc. 7-3, Tr. 65). Plaintiff's IEPs have noted memory problems and that she meets the criteria for learning disability. This information, testimony and school records support that ADT has marked limitations in the domain of acquiring and using information.

(ECF No. 12, PageID.459.)

Plaintiff's argument fails to persuade. To begin, she cites nothing to suggest that the mere existence of an IEP merits finding a marked limitation. Even so, her broad statement simply links the IEP with undifferentiated functioning at school, not functioning within this domain. And she suggests that with the IEP, there is only a risk of falling behind—that is, Plaintiff's first assertion fails to indicate whether ADT is "behind" at all, let alone how any delays relate to acquiring and using information.

Similarly unpersuasive is Plaintiff's citation to her own testimony regarding ADT's diminished workload and her "struggles to keep up." (ECF No. 12, PageID.459.) Plaintiff has not challenged the ALJ's treatment of her testimony, and therefore has forfeited the issue of whether the ALJ's assessment of it was erroneous. *See Gordon o/b/o SMCG v. Comm'r of Soc. Sec.*, 2019 WL 4386940, at *11 (E.D. Mich. May 16, 2019), *rep. & rec. adopted by* 2019 WL 3423320 (E.D. Mich. July 29, 2019).

To the extent she relies on her testimony in a properly raised argument, Plaintiff fails to explain why that testimony merits greater weight. *See* (ECF No. 7, PageID.63 (addressing Plaintiff's testimony).) The ALJ acknowledged the accommodations ADT received. *See* (ECF No. 7, PageID.63-64.) She also noted, however, that Plaintiff's most recent IEP reported that ADT's language skills had improved enough to no longer require special services. (ECF No. 7, PageID.64; *see also id.*, PageID.424-425.) That IEP also showed a "normal ability profile" and age-appropriate expressive and receptive language skills. (ECF No. 7, PageID.423-424.) Her math skills, which continued to lag, were only "moderately delayed" and she remained in the general education curriculum for math (as with all her other subjects) with accommodations for extended-time assignments, group settings for statewide testing, and the use of a calculator. (ECF No. 7, PageID.423-425.) Even earlier evidence of her language problems did not suggest significant problems. As the ALJ noted, 2015 speech testing showed only mild receptive language impairment and she remained generally intelligible; overall, as a ten-year old, she had the language skills of a nine-year old. (ECF No. 7, PageID.407.) Prior tests indicated a mild to moderate impairment but, again, her intelligibility remained high and her receptive language skills

would not cause significant issues except perhaps on lengthy or abstract discussion. (ECF No. 7, PageID.349-352.)

The ALJ canvassed these reports and Plaintiff has failed to demonstrate how the discussion was inadequate or why Plaintiff's testimony is more probative. (ECF No. 7, PageID.63-64.) Similarly, Plaintiff has not attempted to demonstrate how the evidence displays the types of limitations germane to this domain. The ALJ, on the other hand, cited relevant evidence such as Ms. Curtis's questionnaire, which indicated problems in this domain but generally slight or obvious ones, and only one "serious" issue, in math. (ECF No. 7, PageID.65, 226.) The ALJ also relied on the medical consultants, who opined that ADT had less than marked limitations in acquiring and using information. (ECF No. 7, PageID.65, 335.) Plaintiff has not explained why the ALJ should have discounted this evidence in favor of the testimony she cites above.

Additionally, both of Plaintiff's function reports stated that Plaintiff could complete various activities relevant to the domain, including shopping; although the second report stated that ADT did not use public transportation, the earlier report indicated otherwise and no explanation was given for the change. 20 C.F.R. §§ 416.926a(g)(2)(iv)-(v); (ECF No. 7, PageID.220, 235, 247.) Likewise, the earlier form stated that Plaintiff babysat and tried, albeit somewhat unsuccessfully, to cook; although Plaintiff's later form said Plaintiff had stopped babysitting and cooking, no reasons were given why. (ECF No. 7, PageID.234, 246.)

For these reasons, I see no error in the ALJ's handling of this domain. *Cf. Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 833 (6th Cir. 2009) (upholding determination of

26

less than marked impairment where claimant had been held back a year but performed at grade level ("except for math, in which he was about a year behind"), cognitive functioning was in the low average range, and his psychologist's opinion that he had a marked impairment was not supported by testing).

### b.    Attending and Completing Tasks

This domain considers "how well you [*i.e.*, the claimant] are able to focus and maintain your attention, and how well you begin, carry through, and finish your activities, including the pace at which you perform activities and the ease with which you change them." 20 C.F.R. § 416.926a(h). Attention refers to maintaining alertness and concentration long enough to complete a task or activity at an appropriate pace and in "an appropriate timeframe." 20 C.F.R. § 416.926a(h)(1). School-age children

> should be able to focus your attention in a variety of situations in order to follow directions, remember and organize your school materials, and complete classroom and homework assignments. You should be able to concentrate on details and not make careless mistakes in your work (beyond what would be expected in other children your age who do not have impairments). You should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when appropriate. You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores. You should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.

20 C.F.R. § 416.926a(h)(2)(iv). Adolescents should

> be able to pay attention to increasingly longer presentations and discussions, maintain your concentration while reading textbooks, and independently plan and complete long-range academic projects. You should also be able to organize your materials and to plan your time in order to complete school tasks and assignments. In anticipation of entering the workplace, you should be able to maintain your attention on a task for extended periods of time, and

not be unduly distracted by your peers or unduly distracting to them in a school or work setting.

20 C.F.R. § 416.926a(h)(2)(v). Examples of limitations (not necessarily marked or extreme) are the following: "easily startled, distracted, or overreactive" to stimulations; "slow to focus" or fail to complete interesting activities; "repeatedly become sidetracked" or interrupt others; "easily frustrated and give up on tasks"; and "require extra supervision to keep you engaged in an activity." 20 C.F.R. § 416.926a(h)(3).

In her domain analysis, the ALJ noted Plaintiff's testimony that ADT "struggles to complete assigned tasks or finish chores," but that ADT could play videogames and use her phone for hours. (ECF No. 7, PageID.67.) Further, the ALJ noted that ADT did not take medication for ADHD. (*Id.*) Consequently, the ALJ concluded that ADT "has the capacity to focus, at least under certain circumstances, on tasks that are of personal interest to her." (*Id.*) Elsewhere, the ALJ relied on the consultants' opinion, which found that ADT had less than marked limitations in this domain. (ECF No. 7, PageID.65, 400.) The ALJ also gave great weight to Ms. Curtis's questionnaire, which stated that ADT had no problems in this domain. (ECF No. 7, PageID.65, 227-230.) The ALJ likewise gave partial weight to Ms. Murphy's opinion, which noted that ADT could recount stories and had "good recall of details." (ECF No. 7, PageID.65, 351.) Also mentioned in the ALJ's decision was objective evidence of ADT's concentration and focus during testing and evaluations, such as during an August 2014 consultative examination when she was observed to be focused and putting forth her best effort. (ECF No. 7, PageID.63, 347-348.) Likewise, the ALJ noted that ADT read for fun. (ECF No. 7, PageID.64, 247.)

Plaintiff's entire argument on this domain is as follows:

> This domain focuses on how well the minor child can focus and maintain attention. Medical and school records show that ADT needs help to get anything accomplished – both at school and at home (Doc. 7-3, Tr. 69, 72, 78). Plaintiff, ADT's mother, testified that ADT struggles with completing tasks and does not follow rules or complete chores at home. Plaintiff testified that focus was a constant concern, and that ADT could not maintain the focus to do the work required of her peers (*Id.*). ADT has marked limitations in this domain, and as such this matter should be remanded for further review.

(ECF No. 12, PageID.459-460.)

Once again, despite vaguely referencing other evidence, Plaintiff's argument cites only her own testimony, yet she has offered no challenge to the ALJ's assessment of her testimony. *Cf. Gordon*, 2019 WL 4386940, at *11. And, as in the first argument, Plaintiff fails to account for evidence cutting against her position, and thus fails to show why the testimony she cites is more probative than the evidence the ALJ relied on. *Cf. Gordon*, 2019 WL 3423320, at *5 ("But the ALJ—and the plaintiff—also 'must take into account whatever in the record fairly detracts from its [*i.e.*, other evidence's] weight.'" (*citing Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992))). The ALJ acknowledged Plaintiff's testimony but went further and reviewed the other relevant evidence, such as Ms. Curtis's and Ms. Murphy's opinions. (ECF No. 7, PageID.63-65.)

Given this countervailing evidence, Plaintiff needed to explain why her testimony so far outweighs everything else in the record that the ALJ erred by not crediting it. She has not attempted to do that, and it is unlikely she could, as she made other assertions that undercut her cited statements. For example, the paperwork she completed stated that ADT did not struggle with self-care, preparing meals, or doing chores, (ECF No. 7, PageID.220),

and in another form said that she completed chores (sometimes poorly) with supervision and was a good babysitter, (ECF No. 7, PageID.233, 235). She also stated that ADT performed daily activities "well." (ECF No. 7, PageID.244.) Only later did Plaintiff claim that ADT did no chores. (ECF No. 7, PageID.245.) The ALJ recognized some of this evidence in her analysis. (ECF No. 7, PageID.64.) Plaintiff does not address the inconsistency in her assertions or suggest that the ALJ erred by relying on Plaintiff's earlier statements concerning ADT's chores. Nor does she mention the report from Dr. Rehman stating that ADT completed household chores. (ECF No. 7, PageID.278.)

Thus, the ALJ's decision canvassed the record and discussed the relevant evidence. Plaintiff has not pointed out any flaws in this analysis and, instead, offers a few of her own statements in opposition without describing why those statements outweigh the rest of the evidence. In sum, Plaintiff's argument amounts to a request for the Court to reweigh the evidence, which it cannot do. *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) ("The scope of our review is limited to an examination of the record only. We do not review the evidence *de novo*, make credibility determinations nor weigh the evidence."). For these reasons, I recommend rejecting this argument.

### c.   Interacting and Relating With Others

This domain focuses on interpersonal relationship skills, specifically "how well you [*i.e.*, the claimant] initiate and sustain emotional connections with others, develop and use the language of your community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others." 20 C.F.R. § 416.926a(i). Interaction refers to exchanges with others for social or practical purposes, while

"[r]elating" means the ability to form intimate relationships with peers and family members. 20 C.F.R. §§ 416.926a(i)(1)(i)-(ii). This requires intelligible and fluent speech "so that others can understand you," adherence to social rules, and appropriate responses to others. 20 C.F.R. § 416.926a(i)(1)(iii). Relevant activities "may involve playing, learning, and working cooperatively with other children, one-at-a-time or in groups; joining voluntarily in activities" in school or the community; or "responding to persons in authority. 20 C.F.R. § 416.926a(i)(1)(iv).

For school-age children, the regulations state the following:

> When you enter school, you should be able to develop more lasting friendships with children who are your age. You should begin to understand how to work in groups to create projects and solve problems. You should have an increasing ability to understand another's point of view and to tolerate differences. You should be well able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand.

20 C.F.R. § 416.926a(i)(2)(iv). For adolescents:

> By the time you reach adolescence, you should be able to initiate and develop friendships with children who are your age and to relate appropriately to other children and adults, both individually and in groups. You should begin to be able to solve conflicts between yourself and peers or family members or adults outside your family. You should recognize that there are different social rules for you and your friends and for acquaintances or adults. You should be able to intelligibly express your feelings, ask for assistance in getting your needs met, seek information, describe events, and tell stories, in all kinds of environments (e.g., home, classroom, sports, extra-curricular activities, or part-time job), and with all types of people (e.g., parents, siblings, friends, classmates, teachers, employers, and strangers).

20 C.F.R. § 416.926a(i)(2)(v).

In her analysis of this domain, the ALJ noted that ADT's "speech has improved to the point where she is communicating at or above age-appropriate levels. As such, her

31

speech no longer impedes her ability to form relationships with others." (ECF No. 7, PageID.68.) Nonetheless, the ALJ recognized that the most recent IEP indicated ongoing problems with social cues and interpreting others' behavior; for that reason, the ALJ assessed "less than marked" problem (rather than no problem). (*Id.*) Elsewhere in the decision, (ECF No. 7, PageID.63-65), the ALJ discussed other germane evidence: ADT's testimony that she had friends at school, (ECF No. 7, PageID.90-91); Plaintiff's testimony that ADT has temper tantrums, (ECF No. 7, PageID.91-92); the May 2014 report that ADT's speech was 90 to 100% intelligible, within normal limits but with a mild to moderate impairment, (ECF No. 7, PageID.343); the August 2014 showing high levels of speech intelligibility and normal voice, fluency, and receptive language skills, (ECF No. 7, PageID.348, 351-352); a fall 2015 questionnaire completed by a speech pathologist finding only mild receptive language impairment, "mostly intelligible speech," and language skills just a year behind her age, (ECF No. 7, PageID.407-408); and the IEP records, including the most recent which found her language skills to be within normal functional limits, (ECF No. 7, PageID.424). The ALJ also relied on the medical consultants' opinion that ADT's impairment in this domain was less than marked, (ECF No. 7, PageID.355, 400), and Ms. Curtis's opinion that ADT's speech was understandable and there were no problems in this domain, (ECF No. 7, PageID.228-229). (ECF No. 7, PageID.65.)

Against this host of evidence, Plaintiff offers the following argument (in full):

In the domain of interacting and relating with others, ADT continues to struggle. At the time of the CPD, it was determined that ADT had marked limitations in this domain (Doc. 7-2, Tr. 28). ALJ Dietz incorrectly found that because ADT's speech has improved, her difficulties were over (Doc. 7-2, Tr. 34). This is simply not the case. Communication is more than speech,

and at the time of the current hearing, school records confirm that she has had troubles at school. ADT testified that she has been repeatedly in trouble for yelling and talking back (Doc. 7-3, Tr.50-51). Plaintiff testified that ADT had major difficulties reading social cues and often had trouble with her peers (Doc. 7-3, Tr. 77-81). In the domain of interacting and relating to others, there is medical evidence in addition to statements from teachers, her school, and her mother supporting marked limitations in the domain of interacting and relating with others.

(ECF No. 12, PageID.460.)

The same problems in Plaintiff's earlier arguments plague this one as well. Once more she alludes to medical and other records but fails to describe them or their relevance and instead cites only her own and ADT's testimony. She refers to "school records" that confirm unspecified "troubles" at school, but she never elaborates. As she notes, ADT testified vaguely that "sometimes we have problems," by which she meant herself and her fellow students, somehow involving yelling. (ECF No. 7, PageID.50-51.) But it hardly follows, as Plaintiff asserts, that this shows ADT "has been repeatedly in trouble for yelling and talking back." (ECF No. 7, PageID.460.) ADT never mentions "talking back" and the nature of the yelling is unclear.

Moreover, Plaintiff is incorrect in claiming that the ALJ simply concluded that medical improvements eliminated any problems. The ALJ expressly noted ongoing issues with perceiving social cues and others' behavior. (ECF No. 7, PageID.68.) Accordingly, Plaintiff's citation to her testimony regarding social cues is unhelpful; she does not explain why her testimony evidences more severe misperceptions of social cues. And, in fact, the snippet of testimony she cites (and the surrounding pages) does not suggest severe problems. Plaintiff testified that ADT got along with her teachers and elders. (ECF No. 7,

PageID.76.) She then testified that even when schoolmates treated ADT poorly, ADT tried to befriend them. (*Id.*) This could indicate social issues, but as Plaintiff also stated, ADT "don't treat nobody bad." (*Id.*) And although she did not expressly respond in the affirmative when asked if ADT hung out with a group, Plaintiff stated, "All boys, one girl," suggesting she had a group of friends at school (although not at home). (ECF No. 7, PageID.77.) In her paperwork, Plaintiff had also stated that Plaintiff did not struggle getting along with others, although she did not have many friends. (ECF No. 7, PageID.220, 232.)

Thus, Plaintiff's own statements might constitute some evidence of ADT's interpersonal problems, but without more I cannot conclude that the problems were greater than the ALJ determined. The ALJ's analysis, looking at the record as a whole, brought together substantial evidence that ADT's speech was generally fluent and intelligible and that her receptive language skills were mildly impaired at worst and normal by the time of the last IEP. Plaintiff points to no official record of disciplinary problems; tellingly, Ms. Curtis, the teacher, found no problems in this domain. (ECF No. 7, PageID.228.) Consequently, I am unpersuaded by Plaintiff's argument.

### d.     Health and Physical Well-Being

The final domain in Plaintiff's argument is easily disposed of. This domain considers "the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on your [*i.e.*, the claimant's] functioning" that were not consider in the domain of "moving about and manipulating objects." 20 C.F.R. § 416.926a(l). Here is Plaintiff's full argument:

> This domain considers the cumulative effects of a claimant's physical and mental impairments on a child's functioning (20 C.F.R. 416.929a(1)). ALJ Dietz held that despite ADT's diagnosis of ADHD, she has not received advice treatment with medication or therapy (Doc. 7-2, Tr. 37). This incorrectly summarizes the record and testimony. Plaintiff testified that she has sought treatment for ADT's issues for many years, and she provided documentation that she is now seeking therapy at Lincoln Behavioral Services (Doc. 7-2, Tr. 11-20). ALJ Dietz erred when she found that ADT did not suffer marked limitations in this domain, contrary to the record.

(ECF No. 12, PageID.460-461.)

Plaintiff's argument is anachronistic. The evidence he claims the ALJ ignored—records from a couple visits for psychiatric treatment—was created and submitted *after* the ALJ's decision. (ECF No. 7, PageID.43-54.) It was not, therefore, in the record before the ALJ. This fact is critical because the district court is limited to reviewing the Commissioner's final decision. 42 U.S.C. § 405(g). Since the final decision is the ALJ's when the Appeals Council denies review, 20 C.F.R. §§ 404.955, 416.1455, the Sixth Circuit has held that the court cannot consider additional evidence submitted to the Council but which was not part of the record before the ALJ. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Here, the ALJ did not consider the psychiatric records; they were submitted to the Council, which denied review. (ECF No. 7, PageID.35-54, 73-76.) This means that, as both a matter of chronology and of law, the ALJ could not have erred by failing to review these records.

Because the court cannot examine the records either, not much is left of Plaintiff's argument. The only chronologically appropriate evidence she mentions, but provides no citation to, is her testimony that she "has sought treatment for ADT's issues for many years." (ECF No. 12, PageID.461.) But merely seeking treatment is not enough to show

35

that her impairments produced an *extreme* limitation in this domain (which she would need to show, at this point, as she has not demonstrated marked impairments in any other domain, 20 C.F.R. § 416.926a(d)), nor does it show a marked limitation. Indeed, it is hard to see how merely attempting to obtain psychiatric services relates at all to "the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on [ADT's] functioning." 20 C.F.R. § 416.926a(l).

Without any help from the untimely evidence or the uncited testimony, there is nothing to Plaintiff's argument. She fails to flag to any physical effects[5] ADT experienced or how these effects resulted from a physical or mental impairment. Consequently, I recommend rejecting this argument.

Out of an abundance of caution, I will briefly consider this argument in the context of "sentence six" of 42 U.S.C. § 405(g). That statutory sentence provides the proper way to obtain a remand for review of new, material evidence that the claimant had good cause for earlier failing to incorporate into the record. 42 U.S.C. § 405(g). Plaintiff has not invoked "sentence six" and therefore does not to address any of the statutory requirements. Plaintiff, in fact, had the opportunity to address this issue, as Defendant argued waiver in its brief, (ECF No. 14, PageID.492-493), yet she filed no reply to contend that she had preserved a "sentence six" argument. Because she has failed to present or develop a "sentence six" argument, the "sentence six" issue should be deemed forfeited. *See Emerson v. Novartis Pharm. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) ("'[J]udges are not like

---

[5] It is not clear that she considers speech issues to be a qualifying "physical effect," as she makes no argument on the topic.

pigs, hunting for truffles' that might be buried in the record." (citation omitted));

*McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997) ("'[I]ssues adverted to in a

perfunctory manner, unaccompanied by some effort at developed argumentation, are

deemed waived. It is not sufficient for a party to mention a possible argument in the most

skeletal way, leaving the court to . . . put flesh on its bones.'" (citation omitted)).

Even if somehow not forfeited, Plaintiff would lose on the merits. To obtain a

"sentence six" remand, the plaintiff must show among other things that the new evidence

is material. 42 U.S.C. § 405(g). This means that "there is 'a reasonable probability that the

Secretary would have reached a different disposition of the disability claim if presented

with the new evidence.'" *Wyatt v. Sec'y of Health & Human Servs*, 12 F.3d 216, 1993 WL

492311, at *3 (6th Cir. 1993) (*quoting Sizemore v. Sec'y of Health & Human Servs.*, 865

F.2d 709, 711 (6th Cir. 1988)).

The evidence here does not measure up. Two documents are included in the

submission. The first is a single page from the record of an April 26, 2018 visit to Lincoln

Behavioral Services. (ECF No. 7, PageID.54.) One of the problems with this document is

that it contains only half of the medical report, as it says "Page 1 of 2" at the bottom, but

Page 2 is nowhere to be found. (*Id.*) More damaging still, this page is mostly boilerplate

explaining the services that Lincoln Behavioral Services offered. It does show that ADT

was diagnosed with ADHD and depressive disorder, and that educational, social, and other

problems existed. (*Id.*) Even with that information, however, the document says nothing

about physical effects from her impairments. Therefore, this document does not help create

a reasonable probability of a different outcome for Plaintiff on remand—as such, it is not

material.

The second document is a record of a May 15, 2018 visit at Lincoln Behavioral Services. (ECF No. 7, PageID.45-53.) In it, Plaintiff is reported to have stated that ADT was not independent but did make "good choices" and also liked to keep her room clean. (ECF No. 7, PageID.45.) The report further notes that ADT liked to read. (*Id.*) Her needs were "better communication skills with peers," help with developing relationships, and assistance with articulating her emotions. (*Id.*) The rest of the report mostly establishes the objectives and scope of future services; it also includes abundant boilerplate. (ECF No. 7, PageID.45-53.) As with the first document, the second never addresses the physical effects of ADT's impairments. Consequently, the document offers nothing to suggest a different result on remand is possible, and therefore it is not material. Because the evidence Plaintiff cites is not material, it does not warrant a "sentence six" remand.

For the reasons above, I conclude that Plaintiff's argument fails on the merits and any "sentence six" argument has been forfeited. If the Court reaches the "sentence six" issue, I would determine that Plaintiff is not entitled to remand because the evidence she offers is not material.

### 2.    ADT's Accommodations

Plaintiff next argues that the ALJ did not consider the additional accommodations ADT required when compared to her peers. (ECF No. 7, PageID.461-463.) This argument involves Social Security Ruling (SSR) 09-1p, under which the Commissioner promises to consider any help a child receives "to make his functioning possible  or to improve the functioning," because such help indicates "the child will not be as independent as same-

age peers" even if the child is able to function well with the support. SSR 09-1p, 2009 WL 396031, at *6. "The more help or support of any kind that a child receives beyond what would be expected for children the same age without impairments, the less independent the child is in functioning, and the more severe we will find the limitation to be." *Id.* at *7. "The degree of limitation [assessed in any given domain]—whether it is 'marked' or 'extreme'—is based on the answers to . . . questions," which include the following: how well the child functions in all settings, what activities the child can and cannot perform, which activities are limited, where the difficult activities occur (*e.g.*, at home), whether the child can independently start and complete activities, and how much help the child needs. *Fagin ex rel. B.P. v. Comm'r of Soc. Sec.*, 2012 WL 213801, at *5 (S.D. Ohio Jan. 24, 2012), *rep. & rec. adopted by* 2012 WL 481787 (S.D. Ohio Feb. 14, 2012); *see also* SSR 09-1p, 2009 WL 396031, at *2-3. ALJs are not, however, required to discuss all of these factors. SSR 09-1p, 2009 WL 396031, at *3.

After quoting this Ruling, Plaintiff's full argument is as follows:

> The record confirms that ADT has required psychiatric treatment for the past few years with Lincoln Behavior Services. She has been diagnosed with major depressive disorder and ADHD. She has consistently had IEPs that allow her to have extra time and assistance during school (Doc. 7-8, 7-9). Most children of ADT's age, education and background do not require such additional help. On top of difficulties managing her mood and psychiatric state, ADT struggles academically and requires an Individualized Educational Program (IEP) through her school (Doc. 7-9, Tr. 381-391). She must have Resource Room time, small group administration of tests, calculators and time extensions and despite these accommodations she is still struggling to achieve academic goals set in the IEPs. The record also confirms that ADT requires psychotropic medications just to function (Abilify and Fluoxetine, for depression, see Doc. 7-2, Tr. 9-10), which is not typical for children similarly situated (other middle schoolers) who are not suffering from the impairments of major depressive disorder and attention

deficit hyperactivity disorder. Here the minor child requires repeated interventions over the course of each day to keep up with her classmates, but the ALJ has not properly considered the extent of those limitations. This matter must be remanded for a more thorough review of ADT's abilities.

(ECF No. 12, PageID.462-463.)

Plaintiff again misses the mark by relying on post-ALJ-decision evidence that this Court cannot consider.[6] Excising those references from the above paragraph leaves little of her argument except the reference to the IEPs. She has not, however, made any effort to show that the IEP's accommodations—extra time on tests, group setting for state/district assessments, resource room time, and the use of a calculator—represent drastic enough interventions that the ALJ should have assessed more restrictive limitations. She does not say what limitations relate to these accommodations or why they are severe enough to merit reversing the ALJ's decision. Indeed, she does not at all discuss the ALJ's analysis of the accommodations.

The ALJ followed SSR 09-1p's requirements and considered the necessary factors. She addressed the nature of ADT's accommodations but also noted her improvements in

---

[6] Again, nothing suggests Plaintiff means to raise a "sentence six" argument here, and thus it is forfeited. Nor has she done enough to carry the day even had she presented such an argument. She cites her diagnoses of depression and ADHD, but "the diagnosis of a condition, in and of itself, says nothing about the severity of the condition or what limitations it will impose on Plaintiff, let alone whether those limitations are disabling." *Gorney v. Comm'r of Soc. Sec.*, 2018 WL 8345278, at *9 (E.D. Mich. Sept. 12, 2018) (*citing* among other cases, *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)), *rep. & rec. adopted by* 2019 WL 1198697 (E.D. Mich. Mar. 14, 2019). Plaintiff sketches no links between those diagnoses (or ADT's use of psychotropics) to any particular functional limitations, and that means she has failed to demonstrate how any limitations were severe enough to affect the ultimate outcome here. Without developing her contentions in this manner, she leaves all the important work for the Court, which would need to adopt unfounded speculations in order to agree with Plaintiff: that the diagnoses and medications are evidence of limitations, what those limitations are, how severe they are, and how they affect the ALJ's analysis of the domains. Consequently, she has not demonstrated that the evidence is "material" within the meaning of "sentence six" of 42 U.S.C. § 405(g).

the recent IEP and that despite spending some time in the resource room at school she mostly remained in the regular classroom. (ECF No. 7, PageID.63-64.) Plaintiff has not suggested why the ALJ should have found more restrictive limitations based on ADT's accommodations. I decline to speculate why Plaintiff might believe that permission to use a calculator, for example, demonstrates limitations beyond those the ALJ assessed.

In the ALJ's discussion, she also observed evidence of restrictions in ADT's functioning, such her lisp and language problems. (*Id.*) The ALJ also recounted the activities ADT could complete, such as reading books, playing videogames, watching television, answering the telephone and relaying messages, and helping around the house. (*Id.*) The ALJ acknowledged Plaintiff's testimony that ADT has difficulty focusing, following directions, and completing tasks; but Plaintiff does not suggest that the ALJ's decision was inaccurate regarding the activities or testimony. (ECF No. 7, PageID.63.) As noted, she does not say where the ALJ erred in discussing these materials. Consequently, Plaintiff's argument is yet another invitation that the Court cannot accept to reweigh the evidence. *See Brainard*, 889 F.2d at 681.

For these reasons, I conclude that the ALJ complied with SSR 09-1p's requirements and that Plaintiff has failed to articulate much less prove any error.

### G. Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, (ECF No. 12), be **DENIED**, the Commissioner's Motion for Summary Judgment, (ECF No. 14), be **GRANTED**, and this case be **AFFIRMED**.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  December 20, 2019                     S/ PATRICIA T. MORRIS
                                             Patricia T. Morris
                                             United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: December 20, 2019                      By s/Kristen Castaneda
                                             Case Manager